IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DARNETTA L. COLBERT,             )       CASE NO. 5:20-CV-2234
                                 )
          Plaintiff,      )       JUDGE BENITA Y. PEARSON
                                 )
    vs.                     )       MAGISTRATE JUDGE
                                 )       JONATHAN D. GREENBERG
                                 )
COMMISSIONER OF SOCIAL     )
SECURITY,                   )
          Defendant.    )       **REPORT & RECOMMENDATION**

Plaintiff, Darnetta Colbert ("Plaintiff" or "Colbert"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In December 2017, Colbert filed applications for POD, DIB, and SSI, alleging a disability onset date of November 26, 2012 and claiming she was disabled due to back problems and issues with her legs.  Transcript ("Tr.") at 818, 825, 855.  The applications were denied initially and upon reconsideration, and Colbert requested a hearing before an administrative law judge ("ALJ").  Tr. 766.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On August 20, 2019, an ALJ held a hearing, during which Colbert, represented by counsel, and an impartial vocational expert ("VE") testified.  Tr. 618-673.  On November 1, 2019, the ALJ issued a written decision finding that Colbert was not disabled.  Tr. 598-610.  The ALJ's decision became final on August 7, 2020, when the Appeals Council declined further review.  Tr. 1-3.

On October 2, 2020, Colbert filed her Complaint to challenge the Commissioner's final decision. Doc. No. 1.  The parties have completed briefing in this case.  Doc. Nos. 16, 21, 23.  Colbert asserts the following assignments of error:

> (1)  The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul is constitutionally defective.

> (2)  The ALJ committed harmful error when he failed to support his RFC with substantial evidence and erred when he relied on the prior ALJ's decision which was issued by an ALJ who had not been properly appointed.

> (3) Evidence submitted after the ALJ decision was new and material requiring a remand under sentence 6 of 42 U.S.C. 405(g).

Doc. No. 16, p. 1.

## II. EVIDENCE

### A.    Personal and Vocational Evidence

Colbert was born in 1978 and was 34 years old on her alleged disability onset date, making her a "younger" person under social security regulations.  Tr. 609.  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). She has at least a high school education and is able to communicate in English.  Tr. 609.  She has past work as a production line assembler and child monitor.  Tr. 664-665.

### B.    Relevant Medical Evidence[2]

#### 1. Evidence considered by the ALJ

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

**Physical impairments**: On May 11, 2017, Colbert saw Dr. Michael Necci complaining of bilateral hip pain.  Tr. 1108.  Upon exam, she had an antalgic gait, and, in both hips, a limited range of motion and full strength.  Tr. 1110-1111.  She had had intraarticular injections in September (left hip) and November (right hip) 2016 and Dr. Necci recommended another round, which Colbert had on May 17, 2017.  Tr. 1110-1111, 1122.  She also had bilateral hip injections on October 16, 2017 (Tr. 1120-1121).

On May 23, 2017, Colbert saw a nurse at her primary care physician's office; she had been off work since 2012 after a low back injury at work and needed a slip stating she is unable to work.  Tr. 1025.  The record states that diagnostic imaging showed "bulging discs and arthritis."  Tr. 1025.  Upon exam, she had a full range of motion in her back, intact reflexes, and normal strength.  Tr. 1025.

On August 2, 2017, Colbert saw her primary care physician Dr. Michelle Ahmed for a checkup.  Tr. 1023.  She had a diagnosis of low back pain and treated with Mercy Pain Management for that problem.  Tr. 1023. Upon exam, she had a normal gait, full range of motion in her lumber spine, intact reflexes, and normal strength.  Tr. 1023.

 On October 24, 2017, Colbert saw Dr. Jennifer Fautas at Mercy Pain Management for a follow-up for her low back pain.  Tr. 1135.  Upon exam, she had a steady gait, normal heel and toe walking, and she was able to ascend and descend from the chair without difficulty.  Tr. 1137.  Exam of her lumbar spine was "largely unremarkable," with mild range of motion restriction throughout, mild tenderness, no spasms or trigger points, intact strength and reflexes, negative straight leg raise testing seated and, in the supine position, an active raise to 80 degrees on the right and 90 degrees on the left.  Tr. 1138.  She had decreased sensation in the L4 and L5 dermatomes.  Tr. 1138.  Dr. Fautas diagnosed chronic pain syndrome, ordered physical therapy and a steroid injection, continued her medication, and noted that Colbert had failed a drug screen due to levels of THC, which they discussed.  Tr. 1138.

3

On December 1, 2017, Colbert followed up with Dr. Fautas.  Tr. 1130.  She reported benefit from her "present analgesic therapy."  Tr. 1130.  Her exam findings were the same as her prior visit and she was ready to schedule her injection.  Tr. 1130, 1133.  Dr. Fausta added a diagnosis of lumbar spondylosis and scheduled an injection.  Tr. 1133.

On January 16, 2018, Colbert saw Dr. Jamesetta Lewis at Mercy Pain Management for a follow up.  Tr. 1158.  She had had her injection on December 21 and felt no benefit.  Tr. 1158.  Her Zanaflex provided some relief.  Tr. 1158.  She had had an inconsistent drug screen on December 22 (high levels of THC and negative for Oxycodone) and Dr. Lewis advised that they would discontinue her narcotic pain management if her next drug screen was inconsistent.  Tr. 1158.  Upon exam, she had a non-antalgic gait, normal heel and toe walking, full leg strength, normal reflexes, negative straight leg raise testing, mild limited range of motion, tenderness at right L4-5 and midline at L5-S1, and decreased sensation along her right L4-5 dermatomes.  Tr. 1161.

 On June 12, 2018, Colbert had a follow-up with Dr. Fautas; her narcotic drugs were discontinued due to amphetamines in her drug screen.  Tr. 1461.  Colbert disagreed with the drug screen, would not agree to non-narcotic options, and no follow-up appointment was offered.  Tr. 1464.  On June 13, 2018, she had bilateral hip injections.  Tr. 1216-1217.

On July 5, 2018, Colbert saw Dr. Lewis at Mercy Pain Management.  Tr. 1455.  Her exam findings were as her prior visit.  Tr. 1458.  Colbert advised that she had used marijuana recently, which her drug screen would show.  Tr. 1455, 1458.  On July 17, Colbert saw Dr. Lewis, who reviewed her drug screen, gave her a limited narcotic prescription, and advised that Colbert would be closely monitored over the next three months and that if she had another inconsistent drug test she would be discharged.  Tr. 1452.

On November 4, 2018, Colbert went to the emergency room; she had been in a car accident in a

4

parking lot on October 31 and complained of neck and low back pain.  Tr. 1595, 1599.  Lumbar spine x-rays taken on November 4 showed stable, minimal retrolisthesis (when a vertebra slips backwards on another) of L5 on S1.  Tr. 1614.

On November 14, 2018, Colbert saw rheumatologist Dr. Rallis Rajan for multiple joint pain, history of "lumbar disc and degenerative changes," and arthritis in her hip.  Tr. 1407.  She reported pain in her back, hip, and knee, and that she was feeling depressed and stressed due to her financial situation.  Tr. 1407.  She stated that her hip pain was relieved by medication, injections, and aggravated by "extremes of movement and weightbearing."  Tr. 1407.  Upon exam, she had an antalgic gait, decreased range of motion in her hips, and no tenderness to palpation in her spine.  Tr. 1411.  Dr. Rajan assessed multiple joint pain and primary osteoarthritis of both hips.  Tr. 1414.

In February 2019, Colbert had an MRI of her right hip that showed mild degenerative changes.  Tr. 1586.  An MRI of her left hip showed mild to moderate arthritic joint changes with chronic degenerative changes of labrum and periarticular spurring.  Tr. 1587.  She had hip injections that month.  Tr. 1585-1586.  Hip x-rays in April 2019 showed mild degenerative changes in both hips with small collar osteophytes and mild sclerosis and hypertrophic change along the lateral margin of the superior acetabula.  Tr. 1693.

On May 23, 2019, Colbert saw Dr. Jaime DeMarco at Mercy Pain Medicine for back pain and reported that she was happy with her current medication management and did not want any change to her plan of care at that time.  Tr. 1553.  She reported hip pain and was scheduled for right hip surgery in June.  Tr. 1553.  Upon exam, she had full strength, negative straight leg raise testing, normal toe and heel walking, slight limited range of motion, and tenderness along her lumbar spine.  Tr. 1556.

On June 17, 2019, Colbert had arthroscopic, acetabuloplasty, excision, labral repair, and femoroplasty surgery on her right hip.  Tr. 1764-1765.  At a six-week follow up on July 31, Colbert

5

stated that her right hip continued to be painful in her groin area with intermittent giving out when walking.  Tr. 1787.  She had not been working with physical therapy because she thought she was finished with it.  Tr. 1787.  She was advised to resume physical therapy and to start stretches.  Tr 1787.

X-rays of Colbert's hips taken in October 2019 showed degenerative changes, left more prominent than right.  Tr. 1784.

**Mental impairments**: The record indicates that Colbert had a cognitive disorder assessed when she was in high school.  Tr. 942.

Colbert received mental health treatment from CommQuest.  On October 30, 2017, she saw Certified Nurse Practitioner Robert Parsons for a follow up for her major depression and generalized anxiety disorder.  Tr. 1077.  She reported doing "fairly well" since her last visit: her mood had been euthymic and her anxiety was under good control.  Tr. 1077.  She requested a medication change for sleep at night, which Parsons provided.  Tr. 1077-1078.  Upon exam, she had good eye contact, normal speech, logical thought processes, was calm and cooperative, she had a euthymic mood, appropriate affect, and fair insight and judgment.  Tr. 1077.  Her diagnoses were listed as major depressive disorder, single episode, moderate; generalized anxiety disorder; panic disorder; mild cannabis use disorder; and mild alcohol use disorder   Tr. 1078.

On January 3, 2018, Colbert saw Parsons for a follow up and reported some difficulties since her last visit.  Tr. 1198.  She described feeling more depressed and anxious in the wake of her concerns about her failed drug screen at the pain clinic.  Tr. 1198.  She was frustrated and reported suffering a great deal of chronic pain.  Tr. 1198.  She had enjoyed spending time with family over the holidays.  Tr. 1198.  Upon exam, she had good eye contact, normal speech, was calm and cooperative, had logical thought processes, had a euthymic mood, appropriate affect, and fair insight and judgment.  Tr. 1199.

On March 8, 2018, Colbert had a counseling session and reported anxiety and depression, rated

6

11 on a scale 1-10, after a provider advised that she had a small lump in her breast and should see a surgeon.  Tr. 1287, 1375.  Upon exam, her mood was depressed and her affect was appropriate.  Tr. 1387.

On May 9, 2018, Colbert saw Parsons and reported that her condition was unchanged since her last visit; her anxiety was under good control and she had not had recent panic attacks.  Tr. 1375.  Upon exam, she had good eye contact, normal speech, was restless and cooperative, had sequential and logical thought processes, a euthymic mood, appropriate affect, and fair insight and judgment.  Tr. 1376.

On June 11, 2018, Colbert had counseling and was taught stress reduction techniques, how to use positive framing, and advised to refrain from mood altering substances.  Tr. 1389.

On July 5, 2018, Colbert saw Parsons and reported a mildly depressed mood and that her anxiety was under good control.  Tr. 1379.  She had had a positive test for amphetamines at pain management, which she denied taking, and was frustrated because she wasn't getting her pain medications.  Tr. 1379.  Upon exam, she had good eye contact, normal speech, was restless and cooperative, had sequential and logical thought processes, a depressed mood, appropriate affect, and fair insight and judgment.  Tr. 1376.  Her gait was within normal limits.  Tr. 1376.

On September 13, 2018, Colbert saw Parsons, reporting that she had been more depressed and had been having increased anxiety and episodic panic attacks.  Tr. 1382.  She was having problems with her son's father, who had not been supportive.  Tr. 1382.  Upon exam, she had good eye contact, normal speech, was calm and cooperative, had logical thought processes, a euthymic mood, appropriate affect, and fair insight and judgment.  Tr. 1383.

On December 26, 2018, Colbert had a counseling session and reported doing "OK, hanging in there."  Tr. 1723.  On March 4, 2019, Colbert saw Parsons and reported feeling more depressed and having increased issues with insomnia; she was only sleeping five hours a night.  Tr. 1728.  Upon exam,

she had good eye contact, was restless and cooperative, had logical thought processes, had a depressed mood, appropriate affect, and fair insight and judgment.  Tr. 1383.

On May 8, 2019, Colbert saw Parsons reporting that her mood had been stable, mildly depressed, her anxiety was under good control, and she had not had any recent panic attacks.  Tr. 1725.  Her sleep had improved.  Tr. 1725.  Her Klonopin had been helpful.  Tr. 1725.  Upon exam, she had good eye contact, normal speech, was restless and cooperative, had logical thought processes, had an anxious mood, appropriate affect, and fair insight and judgment.  Tr. 1383.

On August 14, 2019, Colbert saw Parsons and reported difficulties since her last visit due to abdominal pain and having had surgery to remove an ovarian cyst.  Tr. 1776.  Her mood had been moderately depressed and she had had moderate anxiety.  Tr. 1776.  She was sleeping 7-8 hours a night and her Klonopin had been helpful.  Tr. 1776.  Upon exam, she had good eye contact, normal speech, was calm and cooperative, had logical thought processes, a euthymic mood, appropriate affect, and fair insight and judgment.  Tr. 1383.

### 2. Evidence submitted to the Appeals Council

On December 4, 2019, Colbert had an MRI of her lumbar spine, which showed disc protrusion centrally and on the left at L5/S1 impinging upon the left L5 nerve root in the neuroforamen, the left S1 nerve root in the central canal and possibly the right S1 nerve root in the central canal, and diffuse degenerative disc disease.  Tr. 574-575.

On December 11, 2019, Colbert saw Dr. James Rosneck for bilateral hip pain.  Tr. 545.  She had not progressed well six months after surgery.  Tr. 545.  She was noted to have failed physical therapy, repeat injections, and hip arthroscopy.  Tr. 454, 547.  She wanted to discuss possible hip replacement.  Tr. 547.

On January 20, 2020, Colbert visited Mercy Pain Management for back pain.  Tr. 536.  She was

assessed as noncompliant with medical treatment, degenerative disc disease of the lumbar spine, myofascial pain syndrome, chronic pain syndrome, and high risk medication management.  Tr. 539.

On March 6, 2020, Colbert had an ultrasound of her thyroid, which showed a "grossly stable subcentimeter cystic/solid thyroid nodules" that had not changed from a prior ultrasound in July 2019. Tr. 411-412.

On June 9, 2020, Colbert had left total hip arthroplasty.  Tr. 55-56.  She had a follow up on June 22 and her left hip was progressing.  Tr. 21.  On July 20, testing revealed DVT within her left peroneal vein.  Tr. 22.

**C.      State Agency Reports**

On February 6, 2018, Frank Stroebel1, M.D., reviewed Colbert's file and adopted the physical RFC from the prior ALJ decision's, dated July 22, 2016, to wit: Colbert could perform light work, no climbing ladders, ropes or scaffolds, occasional kneeling and crouching, and avoiding workplace hazards (unprotected heights, dangerous moving machinery, no commercial driving).  Tr. 701, 682.  On April 29, 2018, Dr. Ermias Seleshi, M.D., reviewed Colbert's filed and agreed with Dr. Stroebell.  Tr. 726.

On February 5, 2018, Robert Baker, Ph.D., reviewed Colbert's file and adopted the mental RFC from the prior ALJ's decision, to wit: Colbert could perform simple, routine tasks with no negotiation, confrontation or arbitration, directing the work of others, or being responsible for the welfare and safety of others; work tasks must be able to be learned in 30 days or less; she cannot perform piece rate work or assembly line work; and she can have occasional interaction with others.  Tr. 701, 682.  On April 27, 2018, Mary K. Hill, Ph.D., reviewed Colbert's file and agreed with Dr. Baker.  Tr. 726-727.

**D.      Hearing Testimony**

During the August 20, 2019 hearing, Colbert testified to the following:

- She lives with her five-year-old son. Tr. 630. She has a driver's license and is able to drive. Tr. 631. She drove herself to the hearing and it took her about 40 minutes. Tr. 631.

- She is not a very good reader and has trouble making out the words when she is reading. Tr. 631. She was in special education classes in school. Tr. 662. She was able pass her written driver's test on the computer because she had studied for it. Tr. 661. She is able to manage her finances. Tr. 661.

- The past few years, until the end of 2018, she had been self-employed, babysitting for friends while they worked full time. Tr. 632-635. Prior to that, Colbert was doing production line work in a factory making cores for train tracks. Tr. 636. She performed that work while standing and the heaviest she had to lift was between 45-50 pounds. Tr. 636. She was promoted to working part-time as a supervisor. Tr. 637. Prior to that job, she worked in a factory making cupcake holders; she performed that work standing and lifted between 50-55 pounds. Tr. 638.

- Since her last disability hearing in 2016, her hips have gotten worse. Tr. 644. She's been getting hip injections beginning in 2016. Tr. 644. If she walks for a long period of time, her hips will shift, and she feels a sharp pain in her pelvis all the way down her legs. Tr. 644. At the hearing, she was wearing a brace on her right hip, which she had surgery on in June. Tr. 644-645. She was noted to have walked with difficulty into the hearing room, and she explained that it was because of her leg and also because she had had surgery a week ago to remove cysts in her fallopian tube. Tr. 645. She did not feel like her hip surgery had been a success; she had been going to physical therapy but had to stop to have her cysts removed. Tr. 645. Before she stopped physical therapy, she felt like she had been making progress. Tr. 646. She had gained a little mobility. Tr. 646. She still had the same amount of pain as before her surgery. Tr. 646-647.

- She also has problems with her left hip, and she will find out on September 11 if she's going to have surgery on that hip, too. Tr. 647.

- Prior to her right hip surgery, the farthest distance she could walk is from one room in her house to another. Tr. 647-648. Standing in place is uncomfortable; washing dishes is difficult. Tr. 648. When sitting, she would have to stand up periodically. Tr. 648. The heaviest weight she could lift now is 10-20 pounds. Tr. 649.

- She had seen a chiropractor for her back problem after a car accident the year prior to the hearing but it had not helped. Tr. 649. Her back pain has gotten worse since 2016; it's hard to get to sleep and she is in pain every day. Tr. 649-650. When she was working in the factory she had had back injections but they did not help at all. Tr. 650. One of the reasons why she has back trouble is because of the work she did, standing and lifting. Tr. 650.

- Her providers had found cysts on her thyroid, which they will continue to monitor. Tr. 652.

- Regarding her mental health, she had problems when her father passed away in 2017. Tr. 652. She takes pills for depression and anxiety and does not sleep at all. Tr. 653. At the

10

time of her hearing, on a Tuesday, she had not slept since Sunday. Tr. 653. She takes Seroquel for sleep. Tr. 653. She experiences anxiety from just thinking and she gets panic attacks. Tr. 654-655. Some days she stays on the couch all day. Tr. 655. When she was babysitting an infant, she kept everything by the couch so she could get up and change and feed the baby. Tr. 655. She takes care of her 5-year-old son all day. Tr. 655. She is able to get up and do what she needs to do to take care of him. Tr. 656.

- She likes to stay by herself. Tr. 656. She does not see other people on a regular basis; she stays at home. Tr. 658. In the past, she has relapsed and used marijuana with other people, including a friend who used to live down the street and would visit. Tr. 659. She sees a therapist; her former one was helpful, but since that therapist retired she hasn't gotten into a rhythm yet with her new one. Tr. 656-657. She has trouble focusing and concentrating and she can take care of herself. Tr. 657. Her adult daughter comes over to help with chores. Tr. 657. She can go out to do things, such as grocery shop, but not for long. Tr. 657-658.

The VE testified that Colbert had past work as a production line assembler and child monitor. Tr. 664-665. The ALJ asked the VE whether a hypothetical individual with the same age, education and work experience as Colbert could perform her past work or any other work if the individual could perform a full range of light work with the following limitations: stand and walk 4 hours in an 8-hour workday; occasional use of foot controls bilaterally; occasionally climb ramps and stairs but never ladders, ropes or scaffolds; occasionally balance, stoop and kneel but never crouch or crawl; never be exposed to unprotected heights, hazardous machinery, or commercial driving; limited to a moderate noise environment consistent with an office setting; can perform simple, routine tasks but not at a production rate pace; limited to simple work-related decisions; occasional interaction with supervisors, coworkers, and the general public; and few changes in a routine setting. Tr. 665-666. The VE testified that the hypothetical individual would not be able to perform Colbert's past work but could perform the following representative jobs in the economy: laundry folder, laundry sorter, and garment packer. Tr. 666-667. The ALJ asked the VE if there were jobs the hypothetical individual could perform with the same restrictions as above but in the sedentary range of work and the VE answered that such an individual could perform the jobs of mail sort clerk, toy stuffer, and surveillance system monitor. Tr. 667-668. The ALJ asked the VE if his answer would change if a limitation was added that the

11

individual would be off-task 20% of the time and the VE stated that there would be no work for such an individual. Tr. 668-669. When asked about absenteeism and off-task behavior, the VE stated that it varies, but that an individual could not miss more than one day of work a month or be off-task 15-20% of the workday. Tr. 669-670.

Colbert's attorney asked the VE whether the individual described in the ALJ's second hypothetical could perform work if a limitation was added "to a general language education level one," and the VE stated that the individual could still perform the job of toy stuffer. Tr. 670-671.

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a). A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that

she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Colbert was insured on the earliest possible disability onset date, November 26, 2012, and remained insured through December 31, 2021, her date last insured ("DLI.").  Tr. 599.  Therefore, in order to be entitled to POD and DIB, Colbert must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.      There exists new and material evidence concerning the claimant's functioning such that I am not bound to adopt all of the findings of the prior ALJ decision. *See generally, Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997); *Dennard*

13

*v. Secretary of Health and Human Services*, 907 F.2d 598 (6th Cir. 1990); ARs 98-4(6), 98-3(6).

3.  The claimant has not engaged in substantial gainful activity since November 26, 2012, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

4.  The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, degenerative joint disease of the bilateral hips, sensorineural hearing loss, obesity, syncope, major depressive disorder, generalized anxiety disorder, cognitive disorder (20 CFR 404.1520(c) and 416.920(c)).

5.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following limitations. The claimant can occasionally operate foot controls bilaterally.  The claimant can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds.  The claimant can occasionally balance, stoop, and kneel.  The claimant cannot crouch or crawl.  The claimant cannot work near unprotected heights or hazardous machinery.  The claimant cannot perform any commercial driving. The claimant is limited to a moderate noise environment consistent with an office setting. The claimant is able to perform simple, routine tasks, but not at a production rate pace. The claimant is able to make simple, work-related decisions.  The claimant is limited to occasional interactions with supervisors, coworkers, and the general public.  The claimant is able to tolerate few changes in the routine work setting.

7.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.  The claimant was born on August **, 1978 and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

11.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12. The claimant has not been under a disability, as defined in the Social Security Act, from November 26, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 601-610.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so

because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

### A. Colbert's constitutional challenge fails

Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019, pursuant to 42 U.S.C. § 902(a).[3]  Section 902(a)(3) provides, "An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of

---

[3] https://www.ssa.gov/history/saul.html.  Saul is no longer the Commissioner.

duty or malfeasance in office." *Id.*  The parties agree that that portion of § 902(a)(3) violates the separation of powers because it limits the President's authority to remove the Commissioner without cause.  Doc. No. 16, pp. 9-10; Doc. No. 21, p. 5; *see also Seila Law LLC v. Consumer Financial Protection Bureau*, -- U.S. --, 140 S. Ct. 2183, 2197 (2020) (statutory restriction on the President's ability to remove the head of an agency ("for inefficiency, neglect, or malfeasance") violates the separation of powers and is unconstitutional); *Collins v. Yellen*, -- U.S. --, 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency (e.g., "for cause," "neglect of duty, or malfeasance in office") violates the separation of powers and is unconstitutional).

The parties disagree as to what effect that unconstitutional removal restriction has on the ALJ's determination of Colbert's disability application.  Colbert argues that she is entitled to remand for a new hearing and decision.  Defendant disagrees, asserting that Colbert must show that the unconstitutional removal restriction caused the denial of her benefits claim and that she does not make such a showing.

In *Seila Law*, the Court found that the unconstitutional removal provision was severable from the other provisions of the relevant statute but did not discuss what a plaintiff must show to obtain relief when challenging actions taken by the head of an agency who derived powers from a statute that included an unconstitutional removal provision.  140 S. Ct. at 2208, 2211.  In *Collins*, the Court took up that discussion and provided guidance regarding the kind of compensable harm a plaintiff must show to be entitled to relief.  141 S.Ct. at 1787-1789.[4]

### 1. *Collins v. Yellen*

*Collins* involved the Federal Housing Finance Agency ("FHFA"), an agency created by Congress tasked with regulating Fannie Mae and Freddie Mac, two of the country's leading sources of mortgage financing.  141 S.Ct. at 1770.  Pursuant to the statute creating the FHFA, the head of the agency was a Director removable by the President "only 'for cause.'"  *Id.*  Fannie Mae and Freddie Mac

---

[4] The Supreme Court decided *Collins* on June 23, 2021, two days after Colbert filed her opening brief.

shareholders challenged an agreement the FHFA had made with the United States Treasury (the "third amendment"), which channeled money from Fannie Mae and Freddie Mac to the Treasury rather than shareholders. *Id*. They argued that the removal provision in the FHFA statute was unconstitutional because, by restricting the President's power to remove the FHFA Director, the statute the violated separation of powers. *Id*. at 1787. The Court agreed. *Id*. (citing *Seila Law*, 140 S. Ct. at 2205). But the Court did not provide the shareholders the remedy that they sought—that "the third amendment must be completely undone"—for the following reasons.

First, the shareholders had sought to undo the third amendment because it was "adopted and implemented by officers who lacked constitutional authority and that their actions were therefore void *ab initio*." *Id*. But the Court noted that the third amendment was adopted by the FHFA's Acting Director, whose position did not have the improper removal restriction that the Director's position had had, so the shareholders' attempt to set aside the third amendment "in its entirety" failed. *Id*. at 1783, 1787. Next, regarding the shareholders' argument with respect to the actions that Directors had taken to implement the third amendment, the Court reasoned,

> All the officers who headed the FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void.

*Id*. at 1787 (emphasis in original).

The Court went on to explain that an unconstitutional provision like the removal restriction could inflict compensable harm, and gave the following examples:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

18

*Id*. at 1789.  The Court remanded the case for consideration of the shareholder's suggestion that "the President might have replaced one of the confirmed Directors who supervised the implementation of the third amendment, or a confirmed Director might have altered his behavior in a way that would have benefited the shareholder."  *Id*. at 1789.

### 2. Colbert does not show compensable harm and is not entitled to a remand

Defendant asserts, and Colbert does not dispute, that the ALJ who decided her case was not appointed by former Commissioner Saul.  Rather, the ALJ was appointed by Saul's predecessor, then-Acting Commissioner Berryhill.  Doc. No. 21, p. 7; Doc. No. 23, p. 5.  And the parties do not dispute that Berryhill's appointment as Acting Commissioner was not made pursuant to § 902(a)(3); did not contain a "for cause" removal provision; and, thus, was not unconstitutional.  Doc. No. 21, p. 7; Doc. No. 23, p. 5.  Accordingly, to the extent Colbert's arguments in her opening brief could be construed as requesting that her case be remanded because the appointment of the ALJ who decided her case was defective because he, in turn, was appointed by Saul, her argument fails.  *See* § 902(b), Deputy Commissioner of Social Security (no removal restrictions for Acting Commissioner); *Collins*, 141 S.Ct. at 1782 (when a statute is silent regarding the President's power to remove an agency head, the officer serves at the President's pleasure; the FHFA statute did not contain removal restrictions on an Acting Director and actions taken by the Acting Director to adopt the third amendment could not be challenged as unconstitutional).

Colbert asserts, "Based on the fact that Andrew Saul's tenure as Commissioner of SSA is unconstitutional, this matter should be remanded for a *de novo* hearing."  Doc. No. 16, p. 10.  But the fact that the removal restriction in § 902(a)(3) is unconstitutional does not entitle Colbert to a remand for a new hearing and decision in her case.  As the Court in *Collins* found, "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" because the

19

removal restriction was unconstitutional. 141 S.Ct. at 1788 ("unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the third amendment," citing *Seila Law*, 140 S.Ct. at 2207–2211). Here, Colbert has not provided a basis for concluding that Commissioner Saul lacked the authority to carry out the functions of the office because of the unconstitutional removal provision.

Colbert contends, "The ALJ in this matter decided this case based on regulations promulgated by Mr. Saul when he had no authority to issue the same. This means that a presumptively inaccurate legal standard was utilized by the ALJ to adjudicate this claim." Doc. No. 16, p. 10; Doc. No. 23, p. 5. She does not cite what regulations Saul promulgated that the ALJ used to decide her case. Moreover, her argument that Saul had no authority to carry out the functions of office because the removal restriction was unconstitutional was rejected by the Court in *Collins*. 141 S.Ct. at 1788. Her assertion in her reply brief that the ALJ who decided her case "was under the delegated authority of a Commissioner who had no constitutionally valid legal authority to delegate" (Doc. No. 23, p. 3) fails for the same reason.

In her reply brief, Colbert asserts, "while Mr. Saul was Commissioner, Social Security modified the way in which musculoskeletal impairments are evaluated (DI 34121.013 and DI 34121.015)." Doc. No. 23, p. 4. But POMS DI 34121.013 and 34121.015 became effective in April 2021 and did not impact Colbert's 2017 application or 2019 hearing and decision. She contends, "the Commissioner appointed ALJs when he was serving per the unconstitutional removal restriction. By inference, the ALJs also served in an unconstitutional manner." Doc. No. 23, p. 4. But she does not dispute that the ALJ in her case was not appointed by Saul; thus, there can be no "inference" drawn that the ALJ who decided her case served in an unconstitutional manner. Finally, she asserts that when Saul was Commissioner, "he implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)." Doc. No. 23, p. 4. But HALLEX 1-2-3-20,

20

"Acknowledgment of Notice of Hearing," sets forth ways in which the Agency communicates to claimants that it received their notice of hearing forms.[5]  It does not modify the way the ALJs write their decisions.  And, in any event, Colbert's request for a hearing was submitted in May 2018; her hearing was scheduled on May 1, 2019; and Colbert acknowledged that she received the notice on May 3, 2019—all before HALLEX 1-2-3-20 purportedly came into effect in July 2019.[6]  Tr. 766, 768, 783, 812. And Colbert does not claim that she suffered any harm as a result of her request for a hearing and her receipt of the Agency's notice scheduling one.

Moreover, none of Colbert's complaints listed above describe the type of compensable harm stemming from an unconstitutional removal provision that was described in *Collins*.  Colbert does not state that when her application was pending the President was unable to remove Saul from office or believed that he was unable to do so.  *Collins*, 141 S.Ct. at 1789.  Her bald assertion that Saul refused to step down as Commissioner thereby "compound[ing] the constitutional defect" (Doc. 16, p. 10) is not supported by any explanation and does not describe how she was harmed at the time of the ALJ's decision in late 2019 or when the Appeals Council denied her request for review in August 2020.  Her reference to a statement made by President Biden when he terminated Saul (Doc. No. 23, pp. 5-6) is also unaccompanied by any description of that statement, the date it was made, and any explanation as to how that statement shows that she suffered compensable harm.

In short, Colbert has not described compensable harm due to the unconstitutional removal provision in § 902(a)(3) under which Saul served as Social Security Commissioner.  Her constitutional challenge fails.

## B. Colbert has not identified an error made by the ALJ

Colbert argues that the ALJ's decision is not supported by substantial evidence for a number of

---

[5]  *See* https://www.ssa.gov/OP_Home/hallex/I-02/I-2-3-20.html (last visited 11/16/2021).

[6]  Colbert does not provide a link to the Hallex provision that she states came into effect in July 2019.

reasons, discussed below.

### 1. Reliance upon a prior ALJ's decision

Colbert argues that the ALJ relied upon a prior ALJ's decision from July 2016 regarding a prior disability application that Colbert had filed and that this was error: First, because the Sixth Circuit in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018), held that that a new application was entitled to a fresh look for a new period of alleged disability; Second, because at the time of her hearing on her prior application in 2016, the ALJ assigned to her case had not been properly appointed.  Doc. No. 16, p. 12 (citing *Lucia v. S.E.C*, 138 S.Ct. 2044 (2018)).  Defendant responds that the decision at issue in this case is the 2019 decision, not the 2016 decision, and that, in any event, the ALJ found that there was new and material evidence in the record and did not rely on the 2016 decision.  Doc. No. 21, p. 17.

In *Early*, the Sixth Circuit held that when a claimant files a new application for a new period of benefits the claimant is entitled to "obtain independent review of it so long as the claimant presents evidence of a change in condition or satisfies a new regulatory threshold."  893 F.3d at 932.  When a claimant files a new application for the same period of time "and offers no cognizable explanation for revisiting the first decision, res judicata would bar the second application."  *Id*. at 933.  Here, Colbert's 2017 application alleged disability beginning in 2012, which overlapped in part with the time period covered in her prior application.  The ALJ conducted an independent review of her 2017 application, found that there was new and material evidence since the 2016 decision (both physical (Tr. 601) and mental (Tr. 607)), and assessed a more restrictive RFC for the entire time period covered in her 2017 application.  That the ALJ referenced the prior ALJ's finding is not error; "Fresh review is not blind review.  A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making."  *Earley*, 893 F.3d at 934.  Thus, Colbert has not shown

that the ALJ violated the rule in *Early*.[7]

In addition, the ALJ's fresh review of Colbert's 2017 application, alleging disability beginning in 2012, cures any alleged defect regarding the appointment of the ALJ who decided Colbert's prior application in 2016.

**2. The ALJ did not err at step three**

At step three of the disability evaluation process, a claimant will be found disabled if her impairment(s) meets or equals one of the listings in the Listing of Impairments.  20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that her condition meets or equals a listing.  *Thacker v. Soc. Sec. Admin*., 93 Fed. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs*., 835 F.2d 139, 140 (6th Cir. 1987)).  Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Id*. at 728 (citing *Evans v. Sec'y of Health & Human Servs*., 820 F.2d 161, 164 (6th Cir. 1987)).  "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to meet the listing."  *Reynolds v. Comm'r of Soc. Sec*., 424 Fed. App'x 411, 414 (6th Cir. 2011) (internal quotation marks omitted).

In his decision, the ALJ considered Listings 1.02, 1.04, 2.10, 12.04, 12.05, and 12.06, and found that Colbert did not have an impairment or combination of impairments that met or medically equaled the severity of one of those listed impairments.  Tr. 603-605.  Colbert asserts that the evidence established that she had "gross anatomical deformity and chronic joint pain and stiffness with signs of limitations of motion or other abnormal motion of the affected joints" (Listing 1.02) and "diagnostic imaging which demonstrated bulging discs and arthritis in her back" (Listing 1.04).  Doc. No. 16, p. 14.

---

[7] At the hearing, Colbert's attorney advised that the only condition that had changed from Colbert's prior application was her hip impairment; her back "maybe has gotten a little worse" and her mental impairment "is probably about where it was."  Tr. 629.

Listing 1.02, Major dysfunction of a joint(s) (due to any cause), is characterized, in pertinent part, by:

> gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

20 C.F.R. § Pt. 404, Subpt. P, App. 1. Section 1.00B2b, in turn, states,

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities…
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.*, 1.00B2b. Here, Colbert does not allege that she has an inability to ambulate effectively or identify evidence in the record indicating the same. Indeed, she was observed on numerous occasions to have a normal gait. Thus, she has not presented "specific medical findings" to show that she satisfies "all the criteria to meet the listing." *Thacker*, 93 Fed. App'x at 728; *Reynolds*, 424 Fed. App'x at 414.

With respect to Listing 1.04, Disorders of the Spine, Colbert argues that she had "diagnostic imaging which demonstrated bulging discs and arthritis in her back" (Doc. No. 16, p. 14), but she has not alleged or shown evidence that she satisfies the criteria of that listing, either. Listing 1.04 requires a

spinal disorder "resulting in compromise of a nerve root (including the cauda equina) or the spinal cord" with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Colbert does not show compromise of a nerve root or spinal cord, motor loss, or positive straight let raise testing, sitting and supine. Listing 1.04 can also be established by showing lumbar spinal stenosis "resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." *Id*. As above, Colbert does not show any of those elements. Her reliance upon diagnostic imaging obtained after the ALJ's decision that was not submitted to the ALJ (Doc. No. 16, p. 14) does not describe an error by the ALJ at step three.

Colbert's challenges to the ALJ's evaluation of her mental impairments at step three also fails. First, she does not cite specific findings by the ALJ that she believes are in error, and she does not cite specific findings in the record showing that she had greater difficulties than the ALJ found. She states that the ALJ found that she "continues to experience some intermittent exacerbations of anxiety and depression" (Tr. 603) but complains, "there was a question as to the length of these exacerbations." Doc. No. 16, p. 17.[8] She does not offer evidence regarding the length of her exacerbations and the undersigned declines to develop that argument for her. Defendant submits that Colbert does not point to evidence showing that her exacerbations lasted, or were expected to last, for over twelve months; does

---

[8] Despite asserting in her brief that the ALJ found that she had some intermittent exacerbations of her anxiety and depression (Doc. No. 16, p. 16), Colbert asserts in her reply brief that the ALJ did not address her intermittent exacerbations of anxiety and depression (Doc. No. 23, p. 1). In his decision, the ALJ remarked upon Colbert's intermittent exacerbations of anxiety and depression and observed that, despite this, she had, in general, benign exam findings and little indications that she had difficulties with memory or managing her daily needs. Tr. 603.

not show that her symptoms during those exacerbations prevented her from performing work consistent

with the ALJ's restrictive RFC finding; and submits that the only two exacerbations of symptoms

Colbert had cited in her factual summary were from September 2018 and March 2019, "neither of which

appeared to require additional treatment beyond medication," "neither of which appeared to last to her

next appointment," and that Colbert still presented at those appointments with normal or mildly

abnormal exam findings, far short of the "marked" findings required to satisfy a listing at step three.

Doc. No. 21, p. 20.  In reply, Colbert offers no substantive answer to Defendant's argument.

Finally, Colbert contends that the ALJ considered Listing 12.05, Intellectual disorder, "without

providing any evidence or findings."  Doc. No. 16, p. 17.  But the ALJ stated that Colbert does not

satisfy Listing 12.05 because she "is not dependent on others for her daily care and needs" and "the

record does not reflect a sufficient low IQ score from adulthood."  Tr. 605.  Those are finding that the

ALJ used to support his conclusion that Colbert does not satisfy Listing 12.05.  Her assertion that the

ALJ failed to consider her intellectual disability (Doc. No. 16, p. 18) is wrong.  See Tr. 605, 607.  Her

additional statement that the ALJ erred because he did not consider whether Colbert equaled any of the

listings (Doc. No. 16, p. 18) is devoid of any argument, and fails.  *See McPherson v. Kelsey*, 125 F.3d

989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some

effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a

possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal

citations omitted).

### 3. The ALJ did not err with respect to Colbert's obesity

Colbert argues that the ALJ did not properly evaluate her obesity.  She complains, "the ALJ

claimed the physical examinations were mostly unremarkable, so [Colbert's] obesity did not cause any

additional limitations."  Doc. 16, p. 14.  The ALJ found her obesity to be a severe impairment at step

26

two (Tr. 602); considered her obesity at step three and stated that, despite her obesity, her exam findings were mostly unremarkable (Tr. 603); and, when assessing her RFC, found that her obesity "is likely exacerbating any pain in the hips, especially with weight bearing activity" and, as a result, limited Colbert to sedentary work and assessed additional limitations. Tr. 607. Thus, the ALJ evaluated her obesity and Colbert does not describe how the ALJ's evaluation was in error.

### 4. The ALJ's RFC assessment is supported by substantial evidence

Colbert contends that the ALJ's RFC assessment included "only…one paragraph [discussing] new evidence which he considered regarding Colbert's hips" and argues that the ALJ "failed to provide sufficient information so this Court can facilitate meaningful judicial review." Doc. No. 16, p. 19. The undersigned disagrees. The ALJ explained,

> What evidence is new and material primarily concerns the impairment to the claimant's bilateral hips. An MRI of these joints dated April 5, 2019 showed degenerative changes involving the bilateral hips with small collar osteophytes and mild sclerosis and hypertrophic change along the lateral margin of the superior acetabula bilaterally (B28F3). However, I note that these degenerative changes were noted to be mild in nature only (B28F3). That said, the claimant would ultimately undergo arthroscopic surgery on her right hip on June 17, 2019 to address some of the degenerative changes therein (B33F3). Up until that point, the claimant had received intermittent pain injections in the hips and also had been treating with pain management for medications (12F22). Subsequent to the surgery, the claimant has continued to report pain and range of motion loss worse on the left than the right. Updated imagings of the hips provide some findings consistent with these claims (B36F1). I also note that the presence of obesity is likely exacerbating any pain in the hips, especially with weight bearing activity (e.g., B5F8, B20F31). Thus, I do find some material worsening in overall exertional tolerance is established when compared to the prior ALJ decision. I find the claimant is limited to sedentary work as compared to the prior limitation to light. I also find the claimant can occasionally operate foot controls bilaterally, can occasionally balance, stoop, and kneel, and cannot crouch or crawl, due to the impairment to her hips.

Tr. 607. That explanation includes sufficient information for the Court to facilitate meaningful judicial review.

Colbert argues that that the ALJ "failed to consider the residual effects of [her] bilateral hip arthritis and the related pain." Doc. No. 16, p. 19. She does not explain what she means by "the

residual effects" of her hip arthritis and related pain; the ALJ considered her hip arthritis and her complaints of pain.

In sum, the ALJ's decision is supported by substantial evidence and must be affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (the ALJ's decision must be affirmed so long as substantial evidence supports the conclusion reached by the ALJ).

## C. Colbert is not entitled to a Sentence Six remand

Colbert argues that she presented new and material evidence to the Appeals Council after the ALJ's decision and that the new evidence entitles her to remand.  Doc. No. 16, p. 20.  Sentence six of 42 U.S.C. § 405(g) allows a court to remand to the agency to develop additional evidence in the record, "but only upon a showing that there is new evidence which is material and that there is good cause for failure to incorporate such evidence into the record in a prior proceeding."  *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (quoting § 405(g)); *Foster v. Halte*r, 279 F.3d 348, 357 (6th Cir. 2001).  In a sentence six remand, the plaintiff has the burden to demonstrate that the evidence she now presents in support of a remand is "new" and "material" and that there was "good cause" for her failure to present it in the prior proceedings.  *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006); *see also Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276-277 (6th Cir. 2010) (although the evidence that the claimant sought to introduce was "new," the claimant failed to meet her burden of showing "good cause" for failure to submit it and that the evidence was "material.").  Evidence is new "only if it was not in existence or available to the claimant at the time of the administrative proceeding"; material "only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence"; and a claimant shows good cause "by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Id*. at 276 (quoting *Foster*, 279 F.3d at 357 (internal quotations

28

omitted)).  A sentence six remand is not appropriate to consider evidence that a claimant's condition

worsened after the administrative hearing.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 753 (N.D. Ohio Jan.

18, 2011) (citing *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992)).

Colbert asserts that an MRI of her lumbar spine taken on December 4, 2019 is new because it

was not available at the time of the ALJ's decision on November 1, 2019. She asserts that it is material

because it shows disc protrusion centrally and on the left at L5/S1 impinging upon the left L5 nerve root

in the neuroforamen, the left S1 nerve root in the central canal and possibly the right S1 nerve root in the

central canal, and diffuse degenerative disc disease.  Doc. No. 16, pp. 20-21.  She argues that that MRI

is objective evidence which supports her prior complaints of "debilitating lower back pain accompanied

by decreased sensation to light touch along the right L4 and L5 dermatomes."  Doc. No. 16, p. 21.  She

states that the ALJ "discounted these findings" and the ALJ could have reached a different conclusion

had he considered the MRI evidence.  Doc. No. 16, p. 21.

Even if Colbert's MRI evidence is "new," it is not material because Colbert does not show a

reasonable probability that the ALJ would have reached a different disposition had he been presented

with the evidence.[9]  *Ferguson*, 628 F.3d at 276.  First, "[t]he mere diagnosis of [an impairment] ... says

nothing about the severity of the condition."  *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)).

Next, the ALJ observed,

> [M]any physical status examinations in this record have showed little signs of lower back
> compromise (e.g., B6F6). The claimant has presented with intact muscle strength in both legs,
> with intact reflex sensation in the same, and with negative straight leg raise testing bilaterally, on
> repeated occasion (e.g., B34F5). While the claimant also has occasionally shown signs of
> positive tenderness across the lower back and some decreased sensation to light touch along the
> right L4 and L5 dermatomes, such signs are not particularly indicative of acute pain levels,
> especially when considered against the largely unremarkable x-ray findings (B24F4, B34F5).

---

[9] Defendant argues that the evidence is not new because Colbert could have obtained an MRI prior to the ALJ's decision.
Doc. No. 21, p. 23 (citing *Templeton v. Comm'r of Soc. Sec.*, 215 F. App'x 458, 464 (6th Cir. 2007) (a medical assessment by
a treating physician was not "new" because the claimant could have requested the assessment prior to the ALJ's decision) and
*Foster*, 279 F.3d at 357 (additional evidence is new if it was not available to the claimant at the time of the administrative
proceeding).

Tr. 607.  Colbert argues that the ALJ's comparison of her pain to unremarkable x-ray findings would change if the ALJ had her MRI results.  Doc. No. 16, p. 21; Doc. No. 23, p. 2.  But the ALJ also noted that Colbert's physical exam findings showed little signs of low back compromise, and those physical exam findings were present throughout the record.  For instance, at Colbert's May 23, 2019 pain management visit for back pain, Colbert had full strength, intact reflexes, and negative straight leg raise testing; she also reported that she was happy with her current medication management and did not want any change to her plan of care at that time.  Tr. 1553, 1556.  And at a visit for hip pain in December 2019, Colbert had a normal gait, had no trouble getting on or off the exam table, had adequate extension and flexion in her back, and negative straight leg raise testing.  Tr. 555.

Furthermore, the evidence Colbert submitted after the ALJ's decision also includes a record from a pain management visit for back pain on January 20, 2020, at which Colbert had argued with her provider about the dates of her MRI when the provider was trying to review the results; argued about what Dr. Lewis had previously documented regarding her medications; and argued about the date of her last lumbar injections—she "[s]pent more time arguing about date than listening…or participating in her plan of care."  Tr. 536, 539.  She was offered injections but declined, stating that they had not helped, and was assessed as noncompliant with medical treatment.  Tr. 539.  All told, Colbert's December 2019 MRI results do not show a reasonable probability that the ALJ would have found her disabled if presented with that evidence.

Colbert also argues that a month after the ALJ's decision Dr. Rosneck had assessed her as having failed right hip surgery.  Doc. No. 16, p. 21.  But the ALJ acknowledged that Colbert continued to report pain and a reduced range of motion after her right hip surgery and that updated imaging of her hips was consistent with those complaints.  Tr. 607.  Colbert had also testified that she did not feel that her hip surgery had been a success and that she experienced the same amount of pain as before her surgery.  Tr.

30

645-647.  Thus, Dr. Rosneck's note indicating that Colbert had failed right hip surgery is not evidence indicating a reasonable probability that the ALJ would have found her disabled had the ALJ seen that note because the ALJ had already considered evidence that Colbert's hip surgery had not been a success. Moreover, at her visit with Dr. Rosneck, Colbert had a normal gait, had no trouble getting on or off the exam table, and had limited range of motion in her hips but full strength, no tenderness, and intact sensation.  Tr. 555-556.

Colbert has not shown that she is entitled to a sentence six remand.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: November 23, 2021                        _s/ Jonathan Greenberg_
                                               Jonathan D. Greenberg
                                               United States Magistrate Judge

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**